**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 22, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

MARLON A. WHITE, SR.,

      Defendant - Appellant.

No. 07-3153

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

BRUCE A. RICHARDSON,

      Defendant - Appellant.

No. 07-3230

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 5:05-CR-40114-SAC)**

---

B. Kay Huff, Lawrence, Kansas, for Defendant-Appellant Marlon A. White.

Donald R. Hoffman, Hoffman & Hoffman, Topeka, Kansas, for
Defendant-Appellant Bruce A. Richardson.

Sangita K. Rao, Department of Justice, Criminal Division, Appellate Section, Washington, D.C. (Eric F. Melgren, United States Attorney, David Zabel, Assistant United States Attorney for the District of Kansas, with her on the briefs), for Plaintiff-Appellee United States of America.

---

Before **HARTZ**, **EBEL**, and **O'BRIEN**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

In these consolidated direct criminal appeals, Defendants-Appellants Marlon A. White, Sr. and Bruce Richardson challenge the district court's refusal to suppress illicit drugs discovered in their car during a traffic stop. Having jurisdiction to consider these appeals pursuant to 28 U.S.C. § 1291, we AFFIRM.

## I.  Background

Because the district court denied Defendants' motion to suppress, we view the evidence presented at the suppression hearing in the light most favorable to the Government. See United States v. Turner, 553 F.3d 1337, 1344 (10th Cir.), cert. denied, 129 S. Ct. 2446 (2009). Viewed in that light, the evidence established the following:

During the early evening hours of Sunday, October 2, 2005, White was driving eastbound on Interstate 70 ("I-70") through Riley County, Kansas, in a silver Cadillac that he had rented in Las Vegas, Nevada. Richardson was a passenger in the car.

At this same time, State Trooper Andrew Dean of the Kansas Highway Patrol was travelling westbound on I-70. Trooper Dean observed White's car heading east, among a group of four or five cars travelling at approximately the posted speed limit of seventy miles per hour. Dean turned his patrol car around and followed this group of cars.

As Dean proceeded eastbound in the left lane, gaining ground on the group of cars, he observed White, ten to twelve car lengths, or approximately 150 to 180 feet, ahead of the trooper's patrol car, enter the left lane and pass another vehicle. Trooper Dean observed that White pulled back into the right lane while he was still too close to the vehicle being passed:

> As [the Cadillac] overtook the other vehicle in the right lane, it then changed lanes into the right lane within approximately two to three car lengths, 30 to 40 feet, approximately. The lane change, to me, was unsafe due to the fact the vehicle that had been passed had to apply its brakes in order to allow the Cadillac to have a safe distance between it and the Cadillac.

(R. v. 3 at 27.) Trooper Dean stopped White at approximately 6:50 p.m. for violating Kan. Stat. § 8-1516(a), which provides, in pertinent part, that "[t]he driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left thereof at a safe distance and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle."

During the traffic stop, White provided the trooper with White's valid Indiana driver's license and the signed rental agreement for the car. In response

3

to Dean's inquiry, White explained that he and Richardson had been to Las Vegas for a few days and were returning home to Indianapolis. According to Trooper Dean, both White and Richardson appeared unusually nervous.

Dean returned to his patrol car to review White's driver's license and the car rental agreement. The rental agreement indicated that White had rented the car in Las Vegas on the previous day, October 1, and he was scheduled to return the car, also in Las Vegas, the next day, October 3. This information, which appeared inconsistent with White's explanation of their travel plans, coupled with White's and Richardson's unusual nervousness, made the trooper suspect that "some type of criminal activity [was] occurring." (R. v.3 at 42.) Trooper Dean, therefore, requested that the state patrol dispatcher run a check on White's criminal history. The dispatcher reported to Dean that White had "a past history of [two separate incidents of] drug-related charges" involving "marijuana or cocaine or methamphetamine." (Id. at 43.) In light of that, Trooper Dean asked Wabaunsee County Sheriff's Deputy Goldner[1] to bring his drug-detection dog to the scene of the traffic stop.

In the meantime, Dean returned the driver's license and rental car agreement to White and issued him a warning for making an improper lane change. The trooper then asked White again about his travel plans. White

---

[1]The transcript of the suppression hearing indicates this deputy's name is Goldner, while the district court's order refers to him as Gollner.

explained that he and Richardson had flown to Las Vegas, stayed for four days, and were now returning to Indianapolis, where White had to be at work the next day, October 3. The pair were then going to return the rental car to Las Vegas the following day, October 4, which, according to the rental agreement, would have been a day late. Trooper Dean found these travel plans to be "very bizarre." (Id. at 47.)

Although Trooper Dean had no intention of letting White and Richardson leave, Dean used the old highway patrol "two-step" in an attempt to get White to consent to further questioning and perhaps a search of the vehicle: After giving White back his driver's license and the rental car agreement, Dean stepped back away from the Cadillac and told White to "have a safe one," as if to end the traffic stop. (Id. at 49.) But when White began to leave, Dean stepped back toward the Cadillac and inquired if he could ask White some additional questions. Although White initially nodded affirmatively, he ultimately did not bite on Trooper Dean's invitation for a consensual conversation, explaining that he had to get back to Indiana in time to go to work the next day.

Unable to obtain White's consent for further questioning, Dean then ordered White and Richardson to stay where they were and advised them that he was going to have a drug-detection dog conduct an exterior sniff of the vehicle. At this point, Trooper Dean called to see how close Deputy Goldner was to their location. Goldner was not close, and "advised [Dean] that it would speed up the

5

process if we could . . . get the Cadillac to the Alma, Kansas, Department of Transportation ["KDOT"] office . . . so [Goldner] could walk the dog around [White's car] there." (Id. at 52-53.)  This KDOT office was located eight or nine miles east of where Dean had stopped White and Richardson, but in the same direction that they had been travelling, and then another one-half to three-quarters of a mile north of the interstate.  Trooper Dean directed White to follow him to the KDOT office.

On the way, White slowed his vehicle and turned into an "improved" turn-around built into the median, as if White was going to turn around and go westbound away from the trooper. (Id. at 55.)  Seeing this, the trooper turned through the highway median and doubled back around White, signalling him to continue eastbound toward the KDOT office.  White complied, re-entering the eastbound lanes of the highway heading toward the KDOT office.

Notwithstanding this brief detour, the trip to the KDOT office took "five to ten minutes." (Id. at 59.)  Deputy Goldner arrived soon thereafter, along with several other state troopers.  As the drug-detection dog sniffed the exterior of White's car, the dog alerted.  Trooper Dean then searched White's car, finding three bundles of marijuana in the trunk.  In light of this discovery, Dean arrested both White and Richardson.  The entire episode, from the initial traffic stop to the drug discovery, lasted between twenty and thirty-five minutes.

At the request of the Kansas highway patrol, a private towing company towed the Cadillac to its lot. Two days later, while the car remained impounded there, Trooper Dean searched the Cadillac more closely, this time finding four "kilo-size" bundles of cocaine under the car's hood. (Id. at 65.)

The United States charged White and Richardson each with several drug trafficking counts. White moved to suppress the evidence discovered as a result of the traffic stop, as well as any incriminating statements he may have made. Richardson joined that motion, and also sought to suppress the incriminating statements he made following his arrest. After an evidentiary hearing, the district court denied these motions. White and Richardson then each entered a guilty plea to the first count charged in the second superseding indictment—conspiracy to distribute cocaine, cocaine base and marijuana, in violation of 21 U.S.C. §§ 812, 841(a)(1) and (b)(1)(A), 846, and 18 U.S.C. § 2.[2] In exchange for these guilty

_____

[2]21 U.S.C. § 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." And 21 U.S.C. § 841(a)(1) makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 812 lists cocaine (Schedule II(a)(4)), cocaine base (Schedule II(a)(4)) and marijuana (Schedule I(c)(10)) as controlled substances. 21 U.S.C. § 841(b)(1)(A) provided the penalties for violations of § 841(a). Lastly, 18 U.S.C. § 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(continued...)

7

pleas, the United States dismissed the remaining three charges pending against each Defendant. The district court sentenced White to 168 months in prison, and Richardson to 151 months. Both sentences were at the low end of their respective guideline ranges.

White's and Richardson's guilty pleas were conditional, made pursuant to Fed. R. Crim. P. 11(a)(2), enabling Defendants to bring these appeals challenging the district court's decision to deny their suppression motion.[3] In their plea agreements, each Defendant waived the right to appeal any other matter.

## II.     Standard of review

"In assessing a denial of a motion to suppress, this court accepts the factual findings of the district court, and its determination of witness credibility, unless they are clearly erroneous. Moreover, this court reviews the evidence in the light most favorable to the government." United States v. Chavez, 534 F.3d 1338, 1343 (10th Cir. 2008) (quotations, citations, alterations omitted), cert. denied, 129

---

[2](...continued)

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

[3]Fed. R. Crim. P. 11(a)(2) provides that,

[w]ith the consent of the court and the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion. A defendant who prevails on appeal may then withdraw the plea.

S. Ct. 953 (2009); see also Turner, 553 F.3d at 1344. While the existence of reasonable suspicion is a factual determination, see United States v. Burkley, 513 F.3d 1183, 1186 (10th Cir.), cert. denied, 128 S. Ct. 2979 (2008), "the ultimate determination" of the reasonableness of a search or seizure under the Fourth Amendment is a question of law reviewed de novo, United States v. Villegas, 554 F.3d 894, 898 (10th Cir.), cert. denied, 129 S. Ct. 2882 (2009). The Government bears the burden of proving that the seizure and search were reasonable. See Turner, 553 F.3d at 1344.

## III. Discussion

The Fourth Amendment protects citizens from "unreasonable searches and seizures" conducted by either state or federal government officials. U.S. Const., amend. IV; see Mapp v. Ohio, 367 U.S. 643, 655 (1961); see also United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1225 n.1 (10th Cir. 2008). In applying these Fourth Amendment's protections, the Supreme Court has recognized "three types of police-citizen encounters[:] '(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.'" United States v. Brown, 496 F.3d 1070, 1074 (10th Cir. 2007) (quoting United States v. Davis, 94 F.3d 1465, 1467-68 (10th Cir. 1996)). "These

9

categories are not static and may escalate from one to another." Cortez v. McCauley, 478 F.3d 1108, 1115 n.5 (10th Cir. 2007) (reh'g en banc). "A reviewing court must analyze each stage of the [police-citizen] encounter, ensuring that the requisite level of suspicion or cause is present at each stage." United States v. Shareef, 100 F.3d 1491, 1500 (10th Cir. 1996).

Defendants' arguments in these appeals implicate the latter two categories of police-citizen encounters, investigative detention and arrest. Defendants argue that 1) the initial traffic stop was unconstitutional; 2) their continued detention after the traffic stop was complete exceeded the reasonable scope of that stop, and 3) their investigative detention became an arrest, unsupported by probable cause, when the state trooper required White to drive ten miles to the KDOT office to facilitate the drug-detection dog's sniff of the exterior of the vehicle.[4] In addressing these arguments, "we examine whether the . . . stop was (1) justified at its inception and (2) reasonably related in scope to the circumstances which justified the interference in the first place." Chavez, 534 F.3d at 1343 (quotation omitted). For the following reasons, we reject all three of Defendants' arguments.

## A. Whether the initial traffic stop was justified at its inception

Although traffic stops are often brief, they are nonetheless "seizures" within the meaning of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648,

---

[4]In the district court, both Defendants also challenged the second search of the Cadillac that occurred several days after Defendants' arrest. On appeal, however, neither Defendant reasserts that argument.

10

653 (1979). "For the duration of a traffic stop, . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers." Arizona v. Johnson, 129 S. Ct. 781, 784 (2009) (quotation omitted). Therefore, both the driver and passenger have standing to challenge the constitutionality of the initial stop. See id. at 787; Brendlin v. California, 551 U.S. 249, 251, 255-59, 263 (2007); United States v. Cortez-Galaviz, 495 F.3d 1203, 1205 & n.3 (10th Cir. 2007). "A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir.), cert. denied, 129 S. Ct. 2881 (2009); see United States v. Gonzales, 535 F.3d 1174, 1181 (10th Cir.) (noting that a traffic stop "is valid if it is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring"), cert. denied, 129 S. Ct. 743 (2008); see also Johnson, 129 S. Ct. at 784; United States v. Clarkson, 551 F.3d 1196, 1201 (10th Cir. 2009). "This court looks only at whether the stop was 'objectively justified'; the officer's subjective motives are irrelevant." Chavez, 534 F.3d at 1344.

### 1. Defendants' arguments raised in the district court

Before the district court, Defendants argued only that Trooper Dean could not have observed White commit a traffic violation because White did not commit one; rather, White argued that he safely cleared the vehicle he was passing before

11

returning to the right lane of the highway. Defendants reiterate that argument on appeal. The district court, however, found that Trooper Dean had reasonable suspicion to believe that White was "not 'safely clear' of the overtaken vehicle within the meaning of that term as used in th[e] [Kansas] statute." (R. v. 1, doc. 63 at 13.) And that factual finding is not clearly erroneous. See generally Burkley, 513 F.3d at 1186 (noting that the existence of reasonable suspicion is a factual determination).

Dean testified at the suppression hearing that he observed White pull over too closely in front of the vehicle he was passing. Dean made this assessment based in particular on the fact that he saw the car being passed hit its brakes as White re-entered the right lane in front of it. Dean went on to testify that, based upon his training and experience, a passing vehicle will safely clear another vehicle if there is a space in between the vehicles equivalent to one car length for every ten miles per hour of speed; in this case, because the vehicles were travelling at approximately seventy miles per hour, a safe distance would have been seven car lengths. Here, Dean observed that White was only three to four car lengths ahead of the vehicle he was passing when he pulled back into the right lane.

Trooper Dean also testified that another guideline for measuring safe distance between passing vehicles is the two-second rule: "When you're following another vehicle, you should be approximately two seconds behind them and—in

12

other words, once car A hits a certain point, car B should hit . . . that same point in about two seconds." (R. v.3 at 30.) Dean estimated that White was less than one second ahead of the vehicle he was passing when he pulled back in front of that passed vehicle. The district court found Dean's testimony to be credible and uncontradicted.

Based upon Dean's testimony, then, the district court's finding that the state trooper had reasonable suspicion to pull White over for unsafely passing another vehicle was not clearly erroneous. See United States v. Lyons, 510 F.3d 1225, 1335 (10th Cir. 2007) (trooper's testimony alone is sufficient, if credible, to establish reasonable suspicion to support traffic stop), cert. denied, 128 S. Ct. 1915 (2008); see also United States v. Worthon, 520 F.3d 1173, 1179-81 (10th Cir.), cert. denied, 129 S. Ct. 332 (2008); United States v. Hanrahan, 508 F.3d 962, 967 (10th Cir. 2007), cert. denied, 128 S. Ct. 1753 (2008).

### 2.    Defendants' arguments raised for the first time on appeal

For the first time on appeal, Defendants raise two new factual arguments and one new legal challenge to the validity of the initial traffic stop. Specifically, Defendants argue that Dean was unable to see whether White re-entered the right lane too soon after passing because the trooper did not have a good vantage point from which to observe the purported traffic violation; it was Trooper Dean, quickly approaching White in the left lane of the highway, who actually caused

13

White to re-enter the right lane soon; and Kan. Stat. § 8-1516(a) is unconstitutionally vague and subject to arbitrary enforcement.

### a.    Richardson's appeal waiver

Richardson cannot assert these three new arguments for the first time on appeal because, as part of his plea agreement, he waived his right to do so: "Defendant knowingly and voluntarily waives any right to appeal or collaterally attack any matter in connection with this prosecution, conviction and sentence, with the limited exception [of] the right to appeal . . . only those issues raised and subsequently denied by the Court with regard to the defendant's motion to suppress."  (R. (Richardson) v. 1, doc. 112, plea agreement at 7, para. 11 (emphasis added).)[5]

In analyzing whether a defendant has in fact waived his opportunity to assert, on appeal, a new argument in support of his suppression motion, this court

---

[5]The Government may be deemed itself to waive a defendant's appeal waiver if the Government does not assert a motion to enforce the plea agreement or seek to enforce that agreement in its appellate brief.  See United States v. Hahn, 359 F.3d 1315, 1328 (10th Cir. 2004) (en banc) (per curiam); see also United States v. Smith, 500 F.3d 1206, 1210 n.1 (10th Cir. 2007).  In Richardson's case, the Government did expressly seek to enforce Richardson's appeal waiver in its answer brief filed with this court.  See United States v. Trujillo, 537 F.3d 1195, 1202 (10th Cir. 2008) (holding Government can seek to enforce a defendant's appeal waiver in the Government's merits brief); see also United States v. Ibarra-Coronel, 517 F.3d 1218, 1221 n.3 (10th Cir. 2008).  In contrast, although it appears that White also made a similar appeal waiver in his plea agreement, the Government has not expressly sought to enforce that waiver against him.  The Government, therefore, has waived its right to enforce White's appeal waiver for purposes of his direct appeal.  See Hahn, 359 F.3d at 1328; see also Smith, 500 F.3d at 1210 n.1.

14

applies the three-pronged enforcement analysis announced in <u>United States v.</u>

<u>Hahn</u>, 359 F.3d 1315 (10th Cir. 2004) (en banc) (per curiam).  <u>See</u> <u>United States</u>

<u>v. Anderson</u>, 374 F.3d 955, 957 (10th Cir. 2004).

> This analysis calls for the court of appeals, in reviewing appeals
> brought after a defendant has entered into an appeal waiver, to
> determine: (1) whether the disputed appeal falls within the scope of the
> waiver of appellate rights; (2) whether the defendant knowingly and
> voluntarily waived his appellate rights; and (3) whether enforcing the
> waiver would result in a miscarriage of justice.

<u>Id.</u> (quoting <u>Hahn</u>, 359 F.3d at 1325); <u>see also</u> <u>United States v. Shockey</u>, 538 F.3d

1355, 1357 & n.2 (10th Cir. 2008).

### i.  Whether Richardson's new arguments fall within his appeal waiver

In his plea agreement, Richardson waived his right to appeal with the

exception of "<u>only those issues raised</u> and subsequently denied by the Court with

regard to the defendant's motion to suppress."  (R. (Richardson) v. 1, doc. 112,

plea agreement at 7, para. 11 (emphasis added).)  That language clearly precludes

Richardson from raising on appeal any new arguments in support of his

suppression motion.  <u>See</u> <u>Anderson</u>, 374 F.3d at 957-58 (holding appeal waiver in

conditional guilty plea agreement precluded defendant from asserting new

argument on appeal in support of suppression motion); <u>see also</u> <u>United States v.</u>

<u>Ochoa-Colchado</u>, 521 F.3d 1292, 1299 (10th Cir. 2008) (noting that, "[w]hen

considering whether an appeal falls within the scope of a waiver of appellate

15

rights, the general rule is that any appellate rights not expressly reserved are waived").

### ii.    Whether Richardson's appeal waiver was knowing and voluntary

This court will "only enforce appeal waivers to which the defendant knowingly and voluntarily agreed." Anderson, 374 F.3d at 958. Nevertheless, it is the defendant who "bears the burden of demonstrating [his] waiver was not knowing and voluntary." Ibarra-Coronel, 517 F.3d at 1222. And here, Richardson makes no such no argument.[6] See Anderson, 374 F.3d at 958-59 (treating appeal waiver as knowing and voluntary where defendant did not address the issue on appeal); see also Lyons, 510 F.3d at 1233 (deeming appeal waiver to be knowing and voluntary where defendant did not specifically address that issue in his opening brief and did not file a reply brief).

### iii.    Miscarriage of justice

This court will still not enforce an appeal waiver made in a plea agreement if doing so would result in a miscarriage of justice. See Anderson, 374 F.3d F.3d at 957, 959. But

> [a]n appeal waiver results in a miscarriage of justice only: "[1] where the district court relied on an impermissible factor such as race, [2] where ineffective assistance of counsel in connection with the

---

[6]As previously mentioned, the United States first made its appeal-waiver argument in its answer brief filed with this court. Because Richardson elected not to file an appellate reply brief, he never specifically addressed the Government's appeal-waiver argument.

16

negotiation of the waiver renders the waiver invalid, [3] where the sentence exceeds the statutory maximum, or [4] where the waiver is otherwise unlawful." In Hahn, we held "that to satisfy the fourth factor–where the waiver is otherwise unlawful–'the error must seriously affect the fairness, integrity or public reputation of judicial proceedings,' as that test was employed in United States v. Olano, 507 U.S. 725, 732 . . . (1993)."

Anderson, 374 F.3d at 959 (quoting Hahn, 359 F.3d at 1327; citation, alterations omitted); see also Shockey, 538 F.3d at 1357. "The burden rests with the defendant to demonstrate that the appeal waiver results in a miscarriage of justice." Anderson, 374 F.3d at 959; see also United States v. Sandoval, 477 F.3d 1204, 1208 (10th Cir. 2007). Again, Richardson never addressed this issue on appeal. Nevertheless, it does not appear to us that this court's refusal to address Richardson's issues in support of his suppression motion, raised for the first time on appeal, will result in such a miscarriage of justice. Therefore, the appeal waiver Richardson made in his plea agreement precludes him from now asserting these new arguments raised for the first time on appeal.

### b. White's arguments raised for the first time on appeal

Even though the Government has not sought to enforce the appeal waiver White made in his plea agreement, White still cannot raise these new arguments for the first time on appeal. Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure requires that a party raise a motion to suppress before trial. A party who fails to do so "waives any Rule 12(b)(3) defense, objection, or request," although "[f]or good cause, the court may grant relief from the waiver." Fed. R.

17

Crim. P. 12(e). This waiver rule applies not only when a defendant fails to file any pretrial motion to suppress, but also when a defendant fails to assert a particular argument in a pretrial suppression motion that he did file. See United States v. Gambino-Zavala, 539 F.3d 1221, 1227 n.2 (10th Cir. 2008); United States v. Barajas-Chavez, 358 F.3d 1263, 1266 (10th Cir. 2004); United States v. Dewitt, 946 F.2d 1497, 1502 (10th Cir. 1991) (addressing previous version of this waiver rule, Rule 12(f)). To avoid waiving a particular argument, the party must make "sufficiently definite, specific, detailed and nonconjectural factual allegations supporting his suppression claim" in his pretrial motion Gambino-Zavala, 539 F.3d at 1227 n.2 (quotation omitted); see also Barajas-Chavez, 358 F.3d at 1266 (noting a party must "set forth plainly in his pre-trial motions the grounds upon which he seeks relief").

In this case, White failed to make any of these three new arguments in his pretrial suppression motion. Nor has he ever asserted that he has good cause that might excuse this failure. See Worthon, 520 F.3d at 1181-82; United States v. Smith, 131 F.3d 1392, 1397 (10th Cir. 1997); United States v. Bryant, 5 F.3d 474, 476 (10th Cir. 1993) (applying prior Rule 12(f)); Dewitt, 946 F.2d at 1502 (same); United States v. Hart, 729 F.2d 662, 665 (10th Cir. 1984) (same). Therefore, we decline to review these arguments on appeal. See Gambino-Zavala, 539 F.3d at 1227; United States v. Brooks, 438 F.3d 1231, 1239-40 (10th Cir. 2006); United States v. Dirden, 38 F.3d 1131, 1139 n.10 (10th Cir. 1994)

18

(applying Rule 12(f)); <u>Bryant</u>, 5 F.3d at 476 (same); <u>Hart</u>, 729 F.2d at 665 (same); <u>United States v. Bridwell</u>, 583 F.2d 1135, 1139-40 (10th Cir. 1978) (same); <u>see also</u> <u>Barajas-Chavez</u>, 358 F.3d at 1265-67 (upholding district court's invoking Rule 12(e) in deciding not to address belated suppression motion); <u>United States v. Miller</u>, 987 F.2d 1462, 1464-65 (10th Cir. 1993) (same, under prior Rule 12(f)).

### 3. Conclusion

For all of these reasons, then, we uphold the district court's finding that Trooper Dean had reasonable suspicion to justify initially stopping White's car.

### B. Whether Trooper Dean's continued detention of Defendants after completing the traffic stop was reasonable

Defendants next challenge the reasonableness of the scope of their detention following the initially valid traffic stop. More specifically, they assert that Trooper Dean, after issuing White a warning for unsafe passing, no longer had justification to continue detaining them.

"In addition to being justified at its inception, a lawful traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place. A seizure that is justified solely by the interest in issuing a warning ticket to the driver may become unlawful if it is prolonged beyond the time reasonably required to complete that mission." <u>Lyons</u>, 510 F.3d 1236 (citations, quotations omitted). "Therefore, once an officer returns the driver's license and vehicle registration and issues a warning ticket, he must allow the

19

driver to proceed without further detention or questioning unless the officer has objectively reasonable and articulable suspicion that the driver is engaged in illegal activity." Id. at 1237; see also Villegas, 554 F.3d at 898 ("A driver must be permitted to proceed after a routine traffic stop if a license and registration check reveal no reason to detain the driver unless the officer has reasonable articulable suspicion of other crimes . . . .") (quotation omitted). But "[t]he traffic stop may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity." Clarkson, 551 F.3d at 1201 (quotation, alteration omitted); see also Lyons, 510 F.3d at 1237-38.

The Government argued that this is exactly what occurred here. The district court agreed, finding that during the initial traffic stop, Trooper Dean acquired reasonable suspicion to believe that White and Richardson were involved in criminal activity other than simply passing unsafely on the highway. Defendants challenge that factual finding on appeal. See generally Burkley, 513 F.3d at 1186 (noting that the existence of reasonable suspicion is a factual determination).

In determining whether an officer acquires reasonable suspicion of other criminal activity during a traffic stop, we will consider "the totality of the circumstances." Clarkson, 551 F.3d at 1201 (quotation omitted); see also Lyons,

20

510 F.3d at 1237. "[T]he level of suspicion required for reasonable suspicion is considerably less than proof by a preponderance of the evidence or that required for probable cause." United States v. DeJear, 552 F.3d 1196, 1200 (10th Cir.) (quotation omitted), cert. denied, 129 S. Ct. 2418 (2009). A factor may raise objectively reasonable suspicions "even if it 'is not by itself proof of any illegal conduct and is quite consistent with innocent travel.'" United States v. Valles, 292 F.3d 678, 680 (10th Cir. 2002) (quoting United States v. Sokolow, 490 U.S. 1, 9 (1989)). But "unparticularized hunches" based on indicators "so innocent or susceptible to varying interpretations as to be innocuous" cannot justify a prolonged traffic stop or vehicle search. United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997) (quotations omitted).

In this case, the district court based its finding that Trooper Dean had reasonable suspicion that Defendants were involved in criminal drug-trafficking activity on four circumstances: (1) Defendants' unusual nervousness; (2) their improbable travel plans; (3) White's criminal history; and (4) Las Vegas's reputation as a narcotics source city and Indianapolis's reputation as a drug distribution hub.

### 1.    Nervousness

Although "[n]ervousness alone cannot support reasonable suspicion of criminal activity," United States v. Salzano, 158 F.3d 1107, 1113 (10th Cir. 1998); see also United States v. Williams, 271 F.3d 1262, 1269 (10th Cir. 2001),

21

this court will consider an officer's observation of nervousness, and particularly extreme nervousness, in weighing the totality of the information available to the officer. See United States v. Contreras, 506 F.3d 1031, 1036 (10th Cir. 2007); United States v. Ledesma, 447 F.3d 1307, 1318 (10th Cir. 2006); United States v. Santos, 403 F.3d 1120, 1127 (10th Cir. 2005). Of course, individuals will be nervous when confronted by a police officer. See Santos, 403 F.3d at 1127; Salzano, 158 F.3d at 1113; Wood, 106 F.3d at 948. Moreover, certain individuals are more prone to external signs of anxiety than others. But police officers encounter displays of nervousness on a daily basis. As such, while this court will view the government's "repetitive reliance" on this factor with caution, Salzano, 158 F.3d at 1113 (quotation omitted), we may still "defer to the ability of a trained law enforcement officer to distinguish between innocent and suspicious action," United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001); see Williams, 271 F.3d at 1268 (stating that extreme and continued nervousness "is entitled to somewhat more weight" in the reasonable suspicion calculus); see also DeJear, 552 F.3d at 1201 (noting that nervousness is an "appropriate factor[] to consider in determining whether reasonable suspicion exists"); Contreras, 506 F.3d at 1036 (noting that, "[a]lthough we have found nervousness to be of only limited significance in determining whether reasonable suspicion exists, it does add to the overall calculus of suspicious behavior, especially when . . . it is extreme").

In this case, Trooper Dean testified that throughout the encounter, White appeared very nervous; he wriggled in his seat and his eyes watered. Dean further asserted that White's level of agitation exceeded that of the average motorist whom Dean had pulled over for a traffic violation. Trooper Dean testified that Richardson was also unusually nervous throughout the traffic stop; "he would kind of look down at the ground as though he was wanting to break eye contact." (R. v. 3 at 35.) The district court found that Trooper Dean's testimony was credible and uncontradicted. See Williams, 271 F.3d at 1269 (relying on officer's testimony that defendant's "extreme nervousness did not dissipate throughout the entire stop").

### 2. "Bizarre" travel plans

"We have noted numerous times that implausible travel plans can form a basis for reasonable suspicion." Contreras, 506 F.3d at 1036; see also United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997) (holding that "contradictory or implausible travel plans can contribute to a reasonable suspicion of illegal activity"); United States v. McRae, 81 F.3d 1528, 1535 (10th Cir. 1996) (concluding that defendant's "unusually cavalier attitude" about how he would return the rental car," is a factor in reasonable suspicion analysis). "[T]he mere existence of a rental agreement with an anticipated return date earlier than the defendant's travel plans would make convenient, without more, [is insufficient to] support[] a finding of reasonable suspicion." Santos, 403 F.3d at 1130. Nor is

23

"the combination of a one-way flight in one direction and a one-way rental vehicle in the other direction . . . the type of unusual itinerary that gives rise to reasonable suspicion." United States v. Karam, 496 F.3d 1157, 1165 (10th Cir. 2007). But here there are additional reasons why Defendants' travel plans seemed bizarre.

White told Trooper Dean that he and Richardson had flown to Las Vegas and had spent four days there. White rented the car he as driving, on October 1, 2003, and he and Richardson intended to drive to Indianapolis so that White could be at work on October 3. The pair then intended to drive the car back to Las Vegas to return it to the rental agency by October 4, 2003. Trooper Dean understandably regarded these travel plans as "bizarre." (R. v. 3 at 47.)

### 3. White's criminal history

"[I]n conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus." Santos, 403 F.3d at 1132 (emphasis added). In this case, the highway patrol dispatcher reported to Trooper Dean that White had a past history of two separate incidents involving marijuana or cocaine or methamphetamine. White's prior drug-related criminal history was the sort of information that would lend credence to Dean's suspicion that White was currently involved in drug trafficking. See Lyons, 510 F.3d at 1237; Santos, 403 F.3d at 1132.

24

### 4. Travel route

Lastly, Trooper Dean testified that White and Richardson were travelling from Las Vegas, "a well-known distribution point for . . . large amounts of drugs," to Indianapolis, "a well-known destination point." (R. v. 3 at 44-45, 93-94.) Because law enforcement officers have offered countless cities as drug source cities and countless others as distribution cities, however, the probativeness of a particular defendant's route is minimal. See Karam, 496 F.3d at 1163; United States v. Guerrero, 472 F.3d 784, 787-88 (10th Cir. 2007); Santos, 403 F.3d at 1132; see also Williams, 271 F.3d at 1270 ("Standing alone, a vehicle that hails from a purported known drug source area is, at best, a weak factor in finding suspicion of criminal activity.").

### 5. Totality of these circumstances

In sum, the factors proffered by the Government, based upon Trooper Dean's testimony, sufficed to support the district court's finding that Dean had reasonable suspicion that Defendants were involved in criminal activity involving drug trafficking. That reasonable suspicion warranted Trooper Dean continuing to detain White and Richardson, even after Dean issued White the traffic warning, in order for the trooper to confirm or dispel his suspicions.[7]

---

[7]Having concluded Dean's continued detention of Defendants did not violate the Fourth Amendment, we need not decide alternatively whether Richardson, as a passenger unauthorized to drive the rental car, had "standing" to challenge his continued detention after the completion of the traffic stop. See

(continued...)

**C. Whether the investigatory detention escalated into an arrest**

Lastly, White and Richardson argue that, for all intents and purposes, they were arrested when Trooper Dean directed White to drive to the KDOT office to facilitate the drug-detection dog's sniff of the exterior of White's rented car. Because Dean did not yet have probable cause at that point, Defendants reason, their arrest violated the Fourth Amendment.

"If a police-citizen encounter exceeds the limits of a <u>Terry</u> [investigative] stop, the detention becomes an arrest that must be supported by probable cause." <u>Rodriguez-Rodriguez</u>, 550 F.3d at 1227 (quotation omitted); <u>see also</u> <u>United States v. Copening</u>, 506 F.3d 1241, 1248 (10th Cir. 2007), <u>cert. denied</u>, 128 S. Ct. 2931 (2008). But because "reasonableness" is the touchstone of Fourth Amendment analysis, the partition between investigative detentions and de facto arrests cannot be defined by any "litmus-paper test." <u>Florida v. Royer</u>, 460 U.S. 491, 506 (1983); <u>United States v. Neff</u>, 300 F.3d 1217, 1220 (10th Cir. 2002) ("The allowable scope of an investigative detention cannot be determined by reference to a bright-line rule; 'common sense and ordinary human experience

---

[7](...continued)
<u>United States v. Smith</u>, 531 F.3d 1261, 1266 n.2 (10th Cir. 2008). Because "standing" in the Fourth Amendment context is not jurisdictional in nature, <u>see</u> <u>United States v. DeLuca</u>, 269 F.3d 1128, 1135 (10th Cir. 2001), we are not obligated to the address the issue here. <u>See</u> <u>Smith</u>, 531 F.3d at 1266 n.2; <u>see also</u> <u>United States v. Jarvi</u>, 537 F.3d 1256, 1259 & n.2 (2008) (noting that concept that a "defendant may not exclude evidence that has been come at by exploitation of a violation of <u>somebody else's</u> rights" has "often been called Fourth Amendment 'standing,' but that is a misnomer").

26

must govern over rigid criteria.'") (quoting United States v. Sharpe, 470 U.S. 675, 685 (1985); see Copening, 506 F.3d at 1248.

"An arrest is distinguished" from an investigative Terry stop "by the involuntary, 'highly intrusive' nature of the encounter." Cortez, 478 F.3d at 1115. For example, "the use of firearms, handcuffs, and other forceful techniques generally exceed the scope of an investigative detention and enter the realm of an arrest." Id. at 1115-16 (quotation, alterations omitted). Or an investigative detention may last too long under the specific circumstances of a given case and on that basis may be transformed into a de facto arrest. See Sharpe, 470 U.S. at 682-88 (eschewing a bright-line rule); see United States v. Rosborough, 366 F.3d 1145, 1150 (10th Cir. 2004) (citing cases); see also Cortez, 478 F.3d at 1116 (holding force used during seizure, as well as its duration, turned investigative detention into "a full custodial arrest").

In this case, however, Defendants do not argue that their investigative detention became an arrest because of the force the state trooper used against them or because of the length of their detention. Instead, they assert only that their investigative detention became a full custodial arrest when Trooper Dean directed White to drive to the KDOT office eight or nine miles down the highway.

The Supreme Court has acknowledged that "there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigative detention." Royer, 460 U.S. at 504; see also

27

United States v. Charley, 396 F.3d 1074, 1080 (9th Cir. 2005) (noting "that there may be certain, case-specific circumstances where law enforcement officers can move a suspect from one location to another without crossing the line between investigative stop and an arrest," citing supporting treatise and case law); 4 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 9.2(g) (4th ed. 2004) ("[I]t seems clear that some movement of the suspect in the general vicinity of the stop is permissible without converting what would otherwise be a temporary seizure into an arrest."). Further, "police may move a suspect without exceeding the bounds of an investigative detention when it is a reasonable means of achieving the legitimate goals of the detention given the specific circumstances of the case."[8] Charley, 396 F.3d at 1080 (quotations omitted); United States v. Gori, 230 F.3d 44, 56 (2d Cir. 2000) ("[I]t is well

---

[8]In this vein, courts have, for example, upheld the transportation of a suspect back to the crime scene for identification. See United States v. McCargo, 464 F.3d 192, 198 (2d Cir. 2006) (concluding, after recognizing that "we have already held that the police may require a person temporarily detained under Terry to move to another place," that transport of suspect in police car to crime scene for investigation was reasonable); Martinez, 462 F.3d at 908 (suspect in bank robbery transported in patrol car to bank for identification); Gallegos v. City of Los Angeles, 308 F.3d 987, 990-93 (9th Cir. 2002) (officers transported suspect to crime scene for identification after handcuffing him); United States v. Short, 570 F.2d 1051, 1054 (D.C. Cir. 1978) (suspect transported to bank for "show up" in front of witnesses). In so holding, the courts have recognized that transporting a suspect back to a crime scene for identification is a prompt way of either substantiating or dispelling the suspicions that precipitated the Terry stop which might present only a minimal intrusion on the suspect. See McCargo, 464 F.3d at 198-99.

28

established that officers may ask (or force) a suspect to move as part of a lawful Terry stop.").

Here, the Terry stop at issue in this case evolved from a traffic stop to Trooper's Dean's developing reasonable suspicion that White and Richardson were involved in criminal activity, likely involving drug trafficking. While "[t]he scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case[,] . . . an investigative detention must be temporary and last no longer than is necessary to effectuate" the purpose of either dispelling or confirming the officer's reasonable suspicion. Royer, 460 U.S. at 500. The question, then, is whether, in light of that purpose, Trooper Dean's actions were "reasonably necessary under the totality of the circumstances," United States v. Melendez-Garcia, 28 F.3d 1046, 1051 (10th Cir. 1994), focusing on whether they were so qualitatively or quantitatively intrusive as to be tantamount to an arrest, see Hayes v. Florida, 470 U.S. 811, 815-16 (1985).

As we previously noted, "[a]n arrest is distinguished [from an investigative stop] by the involuntary, highly-intrusive nature of the encounter." Cortez, 478 F.3d at 1115 (emphasis added). But in this case, Trooper Dean's actions cannot reasonably be described as "highly-intrusive." It would have been constitutionally reasonable for Dean to have continued to detain Defendants, at least for a reasonable time, in order to wait for the canine unit to arrive at the place on the highway where Dean had stopped Defendants. See United States v.

29

Cervine, 347 F.3d 865, 872-73 (10th Cir. 2003) (upholding stop where stop leading to canine investigation lasted approximately fifty minutes); United States v. Villa-Chaparro, 115 F.3d 797, 802-03 (10th Cir. 1997) (just short of forty-five minutes).

Further, the district court found that Trooper Dean's "instruction to follow [him] to another location was for the convenience of the defendants." (R. v. I, doc. 63 at 24.) And there is no suggestion in the record that the trooper's directing White to drive to the KDOT office was for any reason other than to expedite the dog sniff and get White and Richardson on their way quicker. Thus under the circumstances of this case, Trooper Dean directed Defendants to the KDOT office in an effort to expedite the investigative stop. See Sharpe, 470 U.S. at 686 (noting that courts must consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly"); see also United States v. Cline, 349 F.3d 1276, 1288 (10th Cir. 2003).

Nor was the distance and direction White had to drive to go to the KDOT office highly intrusive. White and Richardson were already heading east on I-70. The KDOT office was eight to nine miles in that same direction. See V-1 Oil Co. v. Means, 94 F.3d 1420, 1427 (10th Cir. 1996) (noting ordering trucker to drive three to five miles from where he was originally stopped, in order to permit officer to conduct an administrative safety inspection "caused only a limited

30

increase in the intrusiveness of the inspection"). And the KDOT office was just another one-half to three-quarters of a mile off the highway.

In addition, Trooper Dean communicated to White that, after the drug-detection dog sniffed the exterior of White's car, he would be free to leave, stressing the point that he did not want to hold White up any longer than necessary. And, importantly, Dean had already returned White's driver's license and rental paperwork to him before directing White to drive to the KDOT office. Further, Dean allowed White to drive there himself, bolstering Dean's statement to White that he and Richardson would be free to go just as soon as the drug sniff dispelled the trooper's reasonable suspicion that these men were involved in drug trafficking. Moreover, Dean never raised the stakes during his encounter with White by employing any coercive tactics. Under the particular circumstances of this case, then, Trooper Dean's actions in directing White to drive to the KDOT office in order to expedite the dog sniff were reasonably related in scope to detaining White and Richardson until the trooper was able to confirm or dispel his suspicions that Defendants were involved in ongoing criminal activity.

Defendants rely on United States v. Arango, 912 F.2d 441 (10th Cir. 1990), to argue that their investigative detention became an arrest when Trooper Dean directed them to the KDOT office. Arango, however, is distinguishable. In that case, a Utah highway patrol trooper stopped a truck for speeding. See 912 F.2d at 443. During the stop, the trooper became suspicious because, among other

31

reasons, it appeared that the truck's bed had been modified or altered. See id.

The trooper never returned the driver's license and the truck's registration. See id. Instead, as a pretext for continuing to search the truck, the trooper "told Arango that he had to follow [the trooper] seven miles to the sheriff's office in Richfield to post bail for the traffic citation." Id. Arango, with a state patrol vehicle both in front and behind him, drove to the sheriff's office. See id. Under those circumstances, this court held that "[o]nce the police told Arango to come with them to the sheriff's office, the line between [investigative] detention and de facto arrest was crossed." Id. at 447. Because the court concluded that the officer had probable cause to arrest Arango at that point, however, the court did not delve further into the factual intricacies that transformed that situation from an investigative detention into an arrest. See id.

There are at least three significant reasons why the case at issue here is distinguishable from Arango, as well as the cases on which Arango relies.[9] First,

---

[9]In concluding that the trooper's request in Arango that the suspect follow the trooper to the sheriff's office seven miles away was a "de facto arrest", this court cited two earlier Tenth Circuit cases, United States v. Gonzalez, 763 F.2d 1127 (10th Cir. 1985), and United States v. Recalde, 761 F.2d 1448 (10th Cir. 1985), disagreed with on other grounds, United States v. Zapata, 997 F.2d 751, 759 n.6 (10th Cir. 1993). See Arango, 912 F.2d at 447. In Gonzalez, this court held that an order from a state trooper, who retained the motorist's driver's license, title and registration, that the motorist to follow him to a state patrol office three to four miles away, was an arrest. See 763 F.2d at 1128-29, 1131-33. And in Recalde, this court concluded that an investigative detention became an arrest when a state trooper, retaining the motorist's driver's licenses, the vehicle's registration and the traffic ticket to be issued to the motorist, ordered the driver to
(continued...)

32

here, Trooper Dean did not retain White's paperwork. While this may seem like a minor detail, it bolsters the conclusion that White would be free to go on his way after the canine investigation, if the dog sniff dispelled the officer's reasonable suspicions. Second, Dean saw the trip to the Alma KDOT as a means to expedite the drug dog sniff – and explained that to White.

Third, Dean asked White to go to a KDOT parking lot, and not a police station. While there are admittedly no bright lines in this area of jurisprudence, courts have reiterated that transporting a suspect to a police station weighs heavily in the reasonableness analysis. See Kaupp v. Texas, 538 U.S. 626, 630 (2003) (per curiam) (noting Supreme Court has "never sustained against Fourth Amendment challenge the involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes absent probable cause or judicial authorization") (quotation, alterations omitted); Shareef, 100 F.3d at 1508 (noting that "[t]ransportation of a defendant to the police station can not be justified absent probable cause to believe the defendant committed a

_____

[9](...continued)
follow the trooper to a state police office five miles away. See 761 F.2d at 1451-52, 1454-56. On the way to the office, there was a state patrol car in front of and following the motorist. See id. at 1452. At the police station, the motorist was placed in a small room and interrogated. See id.

33

crime").[10]  For these reasons, we conclude <u>Arango</u> and the cases on which it relies do not control here.

Lastly, we consider Trooper Dean's actions to corral White on I-70 when it appeared that White was dragging his feet during the drive to the KDOT office. "Police may hold a person under <u>Terry</u> in order to pursue 'the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found.'" <u>United States v. Tavolacci</u>, 895 F.2d 1423, 1428 (D.C. Cir. 1990) (quoting <u>Michigan v. Summers</u>, 452 U.S. 692, 702 (1981)).  Clearly, Dean's two U-turns were intended to ensure that White continued to drive to the KDOT office.  These actions, however do not exceed the scope of a valid <u>Terry</u> stop. Dean's actions were minimally coercive – he did not pull White over again nor activate his emergency lights.  Instead, he merely secured compliance with his original request by passing White again and signaling that White should follow him to the KDOT office.[11]

---

[10]For this same reason, the Sixth Circuit case on which Defendants rely, <u>Centanni v. Eight Unknown Officers</u>, 15 F.3d 587, 591 (6th Cir. 1994), is distinguishable.  Unlike in this case, the woman in <u>Centanni</u>, who was not even suspected of a crime, was transported to a police station for questioning and held for four hours.  <u>See</u> 15 F.3d at 588-89.  Here, on the other hand, Trooper Dean had reasonable suspicion that White and Richardson were involved in criminal activity.  In order to dispel or confirm those suspicions in an expeditious manner, Dean directed White to drive five to ten minutes, in the direction he was already heading in order to facilitate a brief dog sniff in the parking lot of a transportation department office.

[11]Having reached this conclusion, we need not address the Government's

(continued...)

34

For these reasons, we conclude that Trooper Dean's directing White to drive to the KDOT office did not escalate from an investigative detention, already supported by Dean's reasonable suspicion of criminal activity, to an arrest requiring probable cause.[12]

## IV.  Conclusion

For all of these reasons, we AFFIRM the district court's decision to deny Defendants' motion to suppress.

---

[11](...continued)
further argument that White's evasive driving provided Officer Dean with probable cause to justify arresting White.

[12]Because Defendants have failed to establish a Fourth Amendment violation, we again need not consider separately the question of whether Richardson, as a passenger without authority to drive the Cadillac, has standing to challenge the search of that vehicle.  See Smith, 531 F.3d at 1266 n.2.  Nor need we address the Government's argument that, even if directing White to drive to the KDOT office violated the Fourth Amendment, the evidence discovered in the car was not fruit of the unlawful transportation.