FILED
United States Court of Appeals
Tenth Circuit

February 2, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

RAFAEL VILLEGAS,

        Defendant - Appellant.

No. 08-4078

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:05-CR-00891-TC-BCW-1)**

Robert Breeze, Salt Lake City, Utah, for Defendant - Appellant.

Diana Hagen, Assistant United States Attorney, (Brett L. Tolman, United States Attorney, with her on the brief), Salt Lake City, Utah, for Plaintiff - Appellee.

Before **BRISCOE**, **EBEL**, and **HARTZ**, Circuit Judges.

**HARTZ**, Circuit Judge.

After a search of his car revealed several packages of illicit drugs, Rafael Villegas was indicted in the United States District Court for the District of Utah on one count of possession "with intent to distribute 50 grams or more of actual

or pure methamphetamine," in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), and one count of possession "with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine," in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B). R. Vol. I Doc. 1 at 1–2. His motion to suppress evidence was denied, and he was convicted by a jury on both counts. On appeal he raises two contentions: (1) that the search of his car was unlawful and (2) that the district court erroneously instructed the jury regarding the definition of "actual or pure" methamphetamine. We have jurisdiction under 28 U.S.C. § 1291 and affirm. We first address Mr. Villegas's challenge to the search of his car and then his challenge to the instruction.

## I.    THE SEARCH

Mr. Villegas was stopped by a police officer for a minor traffic violation. The district court ruled that after the officer gave Mr. Villegas a warning and returned his driver's license and his registration and insurance documents, Mr. Villegas voluntarily consented to further questioning and a search of his car. Mr. Villegas contends that his consent was not voluntary because a hand gesture by the officer after returning the documents constituted an order for him to stay to answer questions. We uphold the district court's ruling.

### A.    Background

In the afternoon of June 12, 2005, Utah Highway Patrol Field Trooper Michael Bradford was parked in his patrol car in front of the Blanding, Utah,

visitors center on State Route 191.  Observing a silver Mercury Grand Marquis traveling northbound, he believed that the car's windows were tinted more than allowed under Utah law, and he noticed the car drift across the white fog line on the side of the road for about 20 feet.

Bradford stopped the car, whose sole occupant was Mr. Villegas.  Bradford requested his driver's license, vehicle registration, and proof of insurance.  Bradford noticed that Mr. Villegas's hands were shaking nervously.  He also observed in the car several religious and patriotic ornaments, six air fresheners, and a bottle of cologne in a front-seat cup holder.  Bradford smelled the fresh odor of cologne.  From his training and experience Bradford believed that the air fresheners and cologne were meant to mask the odor of controlled substances and that the ornaments were to suggest that the driver was an upstanding citizen.

Asked about his travels, Mr. Villegas responded that he was driving from Tucson to Denver to visit his father for a week.  Mr. Villegas told Bradford that he had been living in the United States for 18 years, and Bradford believed that Mr. Villegas spoke passable English.

After returning to his patrol car to check the validity of Mr. Villegas's driver's license and registration, Bradford signaled for Mr. Villegas to come to the patrol car.  He then asked Mr. Villegas additional questions while he filled out a warning for the lane violation.  Mr. Villegas became more nervous while sitting

in the patrol car. Bradford found this suspicious because people usually relax after learning that they are only going to receive a warning.

As Bradford was writing up the warning, Trooper Charlie Taylor arrived and questioned Mr. Villegas while standing by the front passenger window of Bradford's car. Mr. Villegas told Taylor that he was driving from Mesa to Denver to meet a couple family members. Because Mr. Villegas had told Bradford that he was driving from Tucson to visit his father, Bradford asked more specific questions about the trip. Mr. Villegas began to act as if he did not understand Bradford and responded by saying "no comprend[o]" and the like. R. Vol. IV at 26. Taylor returned to the front of his car, which was behind Bradford's, and waited.

After issuing Mr. Villegas a written warning and returning his documents, Bradford advised him that he was free to go and told him something to the effect of "have a good day." *Id.* at 27. As Mr. Villegas began to exit the patrol car—after he had opened the door and placed a foot on the side of the road—Bradford requested to ask some questions. At the suppression hearing Mr. Villegas testified that when Bradford made the request, he simultaneously said "hey" and gestured with his left hand. *Id.* at 122. Mr. Villegas demonstrated the gesture, which he interpreted as indicating that he should stop. Bradford testified that he did not remember making a hand gesture but admitted, "I usually explain things using my hands." *Id.* at 89. The district court found that "Trooper

-4-

Bradford apparently raised his left hand with an open palm to approximately the level of his own chest." *Id.* Vol. I Doc. 108 at 3.

Mr. Villegas responded affirmatively to Bradford's request and sat back down in the patrol car. Bradford asked whether Mr. Villegas had anything illegal in his car—specifically, weapons, marijuana, or cocaine. Mr. Villegas responded that he did not. Bradford then requested consent to search Mr. Villegas's car, and Mr. Villegas responded that he could. When Bradford asked whether Mr. Villegas understood, he answered, "Si." *Id.* Vol. IV at 29.

Bradford and other officers searched the car at the scene and conducted two dog sniffs, but without success. They then had Mr. Villegas drive his car to a mechanic shop 22 miles away (Mr. Villegas does not challenge on appeal the district court's finding that he consented to this) and searched the car after it was raised on a hoist. The officers found five packages of controlled substances.

**B.    Discussion**

On appeal from the denial of a motion to suppress, we review the factual findings of the district court for clear error, but we review de novo the ultimate determination of reasonableness under the Fourth Amendment. *See United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000).

Mr. Villegas's challenge to the search is based on his contention that after Bradford returned his driver's license and other documents, he did not voluntarily

-5-

consent to further questioning. He asserts that Bradford's hand gesture compelled him to stay. As a consequence, he argues, the subsequent search was invalid.

"A driver must be permitted to proceed after a routine traffic stop if a license and registration check reveal no reason to detain the driver unless the officer has reasonable articulable suspicion of other crimes or the driver voluntarily consents to further questioning." *Id.* The government does not contend that Bradford had a reasonable articulable suspicion of other crimes. A traffic stop may become consensual

> if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority. . . . Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter.

*Id.* (internal quotation marks omitted)

Mr. Villegas characterizes Bradford's hand gesture as a "command to halt," Aplt Br. at 15, and contends that a reasonable person would not have felt free to leave. The district court, however, observed Mr. Villegas demonstrate the hand gesture at the suppression hearing and "did not find Mr. Villegas's demonstration indicative of a showing of authority, but found the demonstration more akin to a vague, inconsequential hand gesture." R. Vol. I Doc. 108 at 9.

Although Mr. Villegas asks that we review this finding de novo, our firm rule is that "[w]e uphold a district court's factual findings regarding consent

-6-

unless they are clearly erroneous." *United States v. Cruz-Mendez*, 467 F.3d 1260, 1265 (10th Cir. 2006) (internal quotation marks omitted). The appearance of the hand gesture is a matter of historical fact, not involving an analysis of Fourth Amendment law, and is peculiarly a matter best left to the fact finder. The district court not only saw Mr. Villegas's demonstration but heard Mr. Villegas's and Bradford's testimony regarding the surrounding circumstances. As a fellow circuit court recently said in a similar situation, "On the cold record before us, we cannot recreate the actual gesture demonstrated to the district court. Instead, this type of inquiry recommends our deferential review of the lower court's factual findings." *United States v. Ford*, 548 F.3d 1, 6-7 (1st Cir. 2008). We conclude that the district court's finding was not clearly erroneous.

In light of that proper finding, we affirm the district court's ruling that Mr. Villegas's consent to stay for further questioning was voluntary for purposes of the Fourth Amendment. The consent was not rendered involuntary simply because Mr. Villegas had not completely exited the patrol car when Bradford made the request, particularly because the door to the patrol car was open. *See United States v. Bradford*, 423 F.3d 1149, 1159 (10th Cir. 2005) (fact that defendant was sitting in patrol car when officer solicited consent to further questioning did not make defendant's consent involuntary)*; United States v. Chavira*, 467 F.3d 1286 (10th Cir. 2006) (fact that defendant's path to his vehicle was unobstructed was factor in determining that defendant's consent was

voluntary).  Also, although Trooper Taylor had arrived on the scene, his presence was not significantly coercive because he had walked to the front of his own vehicle, which was behind Bradford's patrol car.  *See Chavira*, 467 F.3d at 1291 (fact that second officer stayed in his own patrol car until first officer obtained consent to search was factor in determining that defendant's consent was voluntary).  Most importantly, the district court found that "all the credible evidence indicates Trooper Bradford was polite and pleasant when he made his request."  R. Vol. I Doc. 108 at 9.  *See West*, 219 F.3d at 1177 ("There was no evidence that [the officer] used a commanding or threatening manner or tone of voice, displayed a weapon, or touched [the defendant].")  Even if Mr. Villegas interpreted Bradford's hand gesture as an order to stop, his subjective understanding of the encounter is not relevant because "[a] person is seized only when that person has an *objective* reason to believe he or she is not free to end the conversation with the officer and proceed on his or her way."  *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996) (emphasis added).

Accordingly, we affirm the district court's denial of Mr. Villegas's motion to suppress.

## II.    JURY INSTRUCTION

The first count of the indictment charged Mr. Villegas with possessing with intent to distribute 50 grams or more of "actual or pure" methamphetamine. R. Vol. I Doc. 1 at 1.  According to the government's chemist, one package seized

from Mr. Villegas's car contained material that was "85.1 percent pure methamphetamine." *Id.* Vol. XI at 23. Mr. Villegas contends that the district court improperly instructed the jury that it could convict him on this count even if it found that he was in possession of something other than "actual or pure" methamphetamine.[1] His contention rests on the premise that one possesses "actual or pure" methamphetamine only if the substance possessed is of 100% purity. We reject that premise.

## A. Background

Jennifer McNair, a forensic scientist from the Utah State Crime Laboratory, testified at trial that she had tested the five packages found in Mr. Villegas's car. Four tested positive for cocaine, which was the basis for Mr. Villegas's conviction on the second count of the indictment. The fifth package contained a crystalline material weighing 439.5 grams. A test of a small portion of the material showed it to be 85.1% methamphetamine. Based on this purity and the

---

[1]In his brief to this court, Mr. Villegas also raises what he terms two "subsidiary issues": (1) that there was insufficient evidence to convict him on this count because the government's expert witness did not testify that he possessed any *pure* methamphetamine, and (2) that the district court constructively amended the indictment by allowing the jury to convict him for possession of *impure* methamphetamine. Aplt. Br. at 20. Mr. Villegas does not, however, show where he raised either argument below. He contends that he raised a sufficiency-of-the evidence argument at trial, but cites only to his closing argument. He does not contend that he raised the constructive-amendment argument below. In any event, our analysis and rejection of his challenge to the jury instruction establishes that his two additional arguments likewise lack merit.

amount of material, she determined that there were 374 grams of actual or pure methamphetamine in the package (439.5 grams x 85.1% = 374 grams).

At the jury-instruction conference Mr. Villegas proposed the following instruction: "The terms 'pure methamphetamine' and 'actual methamphetamine' are synonymous and mean undiluted methamphetamine. If methamphetamine is not pure or actual it is known as a mixture or substance containing a detectable amount of methamphetamine." *Id.* Supp. Vol. XV. The district court rejected the proposed instruction because it did not "want to confuse the jury to think that merely because it's 85 percent pure methamphetamine, you can't find him guilty." *Id.* Supp. Vol. XVI at 14. Instead, the court proposed that the jury be instructed: "'Pure' or 'actual' methamphetamine refers not only to a particular form of methamphetamine but rather to relative purity of any methamphetamine compound." *Id.* Vol. II Doc. 192 at 28. Mr. Villegas objected to this instruction, arguing that the jury could not convict him of possessing pure methamphetamine if the substance he possessed was only 85% methamphetamine. The court rejected his argument and gave its proposed instruction. On a special-verdict form the jury stated that Mr. Villegas possessed with intent to distribute "374 grams or more of actual or pure methamphetamine." *Id.* Vol. II Doc. 194 at 1.

**B.    Discussion**

"This court reviews a trial court's decision on whether to give a particular jury instruction for abuse of discretion and views the instructions as a whole *de*

*novo* to determine whether they accurately informed the jury of the governing law." *United States v. Adkins*, 196 F.3d 1112, 1114 (10th Cir. 1999). "The instructions as a whole need not be flawless, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them." *United States v. Fredette*, 315 F.3d 1235, 1240-41 (10th Cir. 2003) (internal quotation marks omitted).

Count I of the indictment charged Mr. Villegas with a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1). Section 841(a)(1) prohibits knowingly or intentionally possessing with intent to distribute various controlled substances. Section 841(b)(1) sets forth the minimum and maximum sentence for a violation of § 841(a) based on the type and quantity of controlled substance. A defendant may be sentenced to no less than 10 years' imprisonment and up to life imprisonment for the possession of "50 grams or more of methamphetamine . . . or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine." *Id.* § 841(b)(1)(A)(viii).

The circuit courts have repeatedly rejected the argument that the language "50 grams or more of methamphetamine" in § 841(b)(1)(A)(viii) applies only when the material possessed by the defendant is pure methamphetamine (as opposed to methamphetamine found in a mixture or substance). *See United States v. Blake*, 116 F.3d 1202 (7th Cir. 1997); *United States v. Frazier*, 28 F.3d 99 (11th Cir. 1994); *United States v. Rusher*, 966 F.2d 868, 879–80 (4th Cir. 1992);

-11-

*United States v. Alfeche*, 942 F.2d 697 (9th Cir. 1991); *United States v. Stoner*, 927 F.2d 45 (1st Cir. 1991). The defendants in these cases have read § 841(b)(1)(A)(viii) as having two mutually exclusive provisions: (1) the 500-gram provision, which applies when one has "a mixture or substance containing a detectable amount of methamphetamine," and (2) the 50-gram provision, which, according to the defendants, must apply only when there is no such mixture—that is, when the methamphetamine is "pure." But the courts have found it eminently reasonable for Congress to have made the two provisions nonexclusive alternatives, allowing prosecution under the 50-gram provision when a mixture contains at least 50 grams of methamphetamine. They have pointed out that the defendants' construction of the statute would produce the absurdity that an individual with 495 grams of pure methamphetamine could mix in 4 grams of baking soda, resulting in an "impure" mixture of 499 grams, and thereby escape the statutory mandatory minimum because he would possess neither 50 grams of pure methamphetamine nor 500 grams of a mixture or substance containing methamphetamine. *See, e.g., Stoner*, 927 F.2d at 46 (decided when the mandatory minimum was triggered by a fifth of the quantities now required). The courts have found no statutory language or history "indicating that Congress intended such an illogical result." *Id.* Other opinions have also pointed out that because a chemist is highly unlikely to be able to prepare a batch of methamphetamine that

is 100% pure, the 50-gram provision would never apply if the courts adopted the defendants' interpretation. *See*, *e.g.*, *Blake*, 116 F.3d at 1203–04.

Perhaps our case is distinguishable from these precedents because the indictment and the jury instructions, unlike the statute, use the words *actual* and *pure*. *See United States v. Williams*, 376 F.3d 1048, 1051 (10th Cir. 2004) (under law-of-the-case doctrine, government has burden of proving every element of crime set forth in an instruction to which it did not object, even if element is not required by the statute). But, in our view, the addition of those words is immaterial. The United States Sentencing Guidelines are instructive in this regard. USSG § 2D1.1(c) is a table setting forth base offense levels for drug offenses depending on the quantity of drugs involved. The quantities for methamphetamine are expressed in terms of one quantity for "Methamphetamine" and one-tenth as much for "Methamphetamine (actual)." *E.g.*, USSG § 2D1.1(c)(1) (setting a base offense level of 38 for "15 KG or more of Methamphetamine, or 1.5 KG or more of Methamphetamine (actual)"). Notes (A) and (B) to that provision explain the meaning of the language in the table:

> Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance.

*Id.* § 2D1.1(c), n.(A).

> The terms "PCP (actual)", "Amphetamine (actual)", and "Methamphetamine (actual)" refer to the weight of the controlled substance, itself, contained in the mixture or substance. For

example, a mixture weighing 10 grams containing PCP at 50% purity contains 5 grams of PCP (actual). In the case of a mixture or substance containing PCP, amphetamine, or methamphetamine, use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the PCP (actual), amphetamine (actual), or methamphetamine (actual), whichever is greater.

§ 2D1.1(c), n.(B). Thus, in the case before us the amount of "Methamphetamine (actual)" would be calculated just as the government chemist testified and as the jury found: 439.5 grams of mixture x 85.1% purity = 374 grams of actual or pure methamphetamine. Although the present guidelines use the word *actual* and not *pure*, the current term "Methamphetamine (actual)" replaces the earlier language "Pure Methamphetamine" in both the table and the defining notes. *See* USSG app. C, amend. 395 (Nov. 1, 1997). Although the Sentencing Commission has decided that the term "Methamphetamine (actual)" is superior to "Pure Methamphetamine," it has construed both terms as referring to the amount of methamphetamine present in a mixture.

We adopt the same view as our fellow circuits regarding the meaning of § 841(b)(1)(A)(viii), and the same view as the Sentencing Commission regarding the meanings of *pure* and *actual*. Mr. Villegas's interpretation appears to be based on a misconception that "pure" methamphetamine is something different from methamphetamine found in a mixture. But methamphetamine is the same specific compound wherever it is found. A molecule is either methamphetamine or it is not. A molecule cannot be, for example, 85% pure methamphetamine.

Percentage of purity is not a feature of the compound itself but rather a measure of what other compounds—that is, what other kinds of molecules—are present in the package (or pill, or other product). To say that a substance is 85% methamphetamine or 85% pure methamphetamine is to say that 85% of the substance (by weight or perhaps another metric) is methamphetamine molecules.

From this point of view, the requirements of § 841(b)(1)(A)(viii) are rather straightforward. A defendant comes within that section in two possible ways. First, he may possess 500 grams or more of a mixture or substance that contains enough methamphetamine molecules that the methamphetamine is detectable. Second, he may possess a substance or mixture that contains methamphetamine molecules whose total weight equals or exceeds 50 grams. When, as in this case, a chemist multiplies the weight of a substance or mixture by the percentage (by weight) of the substance that is composed of methamphetamine molecules (which could range from less than 1% to more than 99%), the chemist is computing the weight of the methamphetamine molecules in the substance or mixture. If that weight equals or exceeds 50 grams, then the defendant possessed 50 or more grams of methamphetamine and is subject to punishment under § 841(b)(1)(A)(viii).

It is not obvious to us that use of the terms *pure methamphetamine* and *actual methamphetamine* is an improvement over using simply the term *methamphetamine*, and we do not recommend the instruction in this case. But the

-15-

issue is intuitively clear, so it is unlikely that the instruction's terminology would confuse a jury, at least when an expert chemist explains the calculation, as happened here. The chemist's calculation produced the pertinent number for purposes of § 841(b)(1)(A)(viii) and the jury adopted that same number in its special verdict. We see no reversible error in the district court's use of the challenged instruction or its rejection of Mr. Villegas's proposed instruction.

## III.    CONCLUSION

We AFFIRM the judgment below.