Filed 9/14/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D074047 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FBA1200485) |
| JORGE AREBALOS-CABRERA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Eric M. Nakata and Charles J. Umeda, Judges.  Affirmed.

Erica Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Collette C. Cavalier, and Elizabeth Renner, Deputy Attorneys General, for Plaintiff and Respondent.

Following a hung jury and mistrial, a second jury convicted Jorge Arebalos-Cabrera of transporting over 10 kilograms of heroin (Health & Saf. Code, §§ 11352, subd. (a), 11370.4, subd. (a)(3)), transporting over four kilograms of methamphetamine

(*id*., §§ 11379, subd. (a), 11370.4, subd. (b)(2)), and using a false compartment (*id*., § 11366.8, subd. (a)). The trial court sentenced him to a total term of 17 years four months in prison.

Arebalos appeals. He contends the trial court erred by denying his motion to suppress evidence found during a search of his tractor-trailer and by denying his second motion to suppress on jurisdictional grounds. We disagree and affirm.

FACTS

For purposes of this section, we state the evidence in the light most favorable to the judgment. (See *People v. Osband* (1996) 13 Cal.4th 622, 690; *People v. Dawkins* (2014) 230 Cal.App.4th 991, 994.) Additional facts will be discussed where relevant in the following section.

Arebalos was with a group of individuals being surveilled by law enforcement as part of a multiagency regional narcotics suppression program. On August 24, 2012, after observing what they believed to be suspicious behavior indicative of narcotics trafficking, police officers contacted the California Highway Patrol (CHP) and identified Arebalos's tractor-trailer as possibly transporting narcotics.

A CHP officer, Roberto Adelmann, made contact with Arebalos's tractor-trailer on a freeway near Barstow. Adelmann was part of a special enforcement unit focused on drug interdiction. He was accompanied by a police dog trained to detect narcotics. At trial, Adelmann explained that when another agency identifies a vehicle to him, he watches the vehicle to see whether there is a reason to pull it over. If he sees a reason, he

will make the traffic stop.  If not, he will either let the vehicle go or call the agency to see if they have a basis for any other action.

In this instance, Adelmann observed Arebalos speeding and weaving across the white lane lines.  He stopped Arebalos for these violations.  During the stop, Adelmann checked Arebalos's license, registration, commercial logbook, and the paperwork for his trip.  The tractor (commonly known as the "cab") was registered to Arebalos.  His logbook showed no trips for almost a month.  Adelmann believed this was unusual.  Adelmann performed a field sobriety test on Arebalos, but he did not find any signs of impairment.

Adelmann gave Arebalos's documents back and asked for his consent to search the tractor.  Arebalos agreed, both verbally and in writing.  After examining the tractor with his police dog, Adelmann discovered two secret compartments.  Both compartments had been modified to transport narcotics.  One was empty.  The other contained over 10 kilograms of heroin and over four kilograms of methamphetamine in wrapped packages.  Arbelos was arrested.  On the night of his arrest, he admitted to police that he was the sole owner of the tractor and he never lent it to anyone.  At trial, Adelmann and another police officer opined that narcotics traffickers would not entrust such a large amount of narcotics—with a total value of roughly $500,000—to someone who did not know it was there.

Arebalos testified in his own defense.  He said he worked as an independent truck driver and found jobs through brokers online.  He said he did not own the tractor, did not know it was registered to him, and had not seen it for several weeks.  He claimed not to

3

know about the narcotics or the secret compartment in which they were found. He said he believed he was transporting cereal to Ohio.

DISCUSSION

I

*Initial Motion to Suppress*

A. *Additional Background*

Arebalos contends the trial court erred by denying his motion to suppress evidence found as a result of Adelmann's search of the tractor-trailer. Before his first trial, Arebalos moved to suppress the evidence under Penal Code section 1538.5 (section 1538.5). He primarily argued (1) he had been illegally detained at the time he gave consent because the traffic stop had been unconstitutionally extended by Adelmann's investigation into matters unrelated to the stop and (2) his consent was involuntary.

At the suppression hearing, Adelmann testified about the circumstances of the traffic stop. After confirming Adelmann was on duty on the day in question, the prosecutor asked, "And around 10:00 p.m., did you notice a big rig that caught your attention?" Adelmann answered, "Yes, sir." The prosecutor: "What caught your attention about it?" Adelmann: "The truck—the big rig truck and trailer rotation was weaving as well as speeding." Adelmann explained that the tractor-trailer was travelling approximately 62 miles per hour, and the speed limit was 55 miles per hour for a tractor-trailer in that area. He said the tractor-trailer crossed the white lane lines approximately three times.

Adelmann initiated a traffic stop of the tractor-trailer driven by Arebalos. Arebalos complied and pulled to the side of the freeway. At the outset of the stop, Adelmann asked Arebalos for his driver's license, logbook, and paperwork for the trip. Arebalos complied. After asking him to step out of the cab, Adelmann talked with Arebalos about his logbook, which did not show any trips for about a month. Adelmann thought this was unusual. During this conversation, Arebalos appeared nervous. At some point, approximately five to 10 minutes into the stop, Adelmann's partner officer arrived in a second CHP vehicle. Adelmann had him run a check on Arebalos's driver's license and the tractor-trailer. Adelmann performed a field sobriety test, but Arebalos did not appear impaired.

While his partner officer was running the check, Adelmann handed back Arebalos's documents and told him he was free to leave. Arebalos began to walk back to the tractor-trailer. Adelmann then asked and obtained Arebalos's consent to search, both orally and in writing. The stop had lasted approximately 15 to 20 minutes at that point. Adelmann examined the tractor with his police dog and eventually discovered the narcotics hidden there.

On cross-examination, defense counsel asked, "Had you been notified prior to the stopping of this vehicle that this vehicle was carrying contraband?" The prosecutor objected based on relevance. The court asked, "What difference does it make?," and defense counsel responded, "Probably not [*sic*] at this time. You're absolutely correct, your Honor. I'm going to ask that he be ordered to remain after we finish the cross-examination and recross as my witness." After Adelmann's testimony had been

5

completed, the court asked defense counsel whether he wanted to examine Adelmann as his own witness at that point. Defense counsel declined because he wanted to examine Arebalos first.

Arebalos testified that he was travelling at 62 miles per hour because he had just passed another truck. He saw two police cars on an overpass. After Arebalos passed, they turned on their emergency lights and stopped him. Approximately 20 minutes into the stop, the officers told Arebalos he could leave. He walked five or six steps, and one said, "No. Hold on a second. I want you to sign this paper." Arebalos claimed that Adelmann and his police dog had already been in the tractor once or twice before then. He claimed they put him in handcuffs and sat him in a police car. He said he signed the paper because "[t]here was no way out of it, because then they're not going to let you go."

At the conclusion of Arebalos's testimony, the court asked defense counsel whether he had any other witnesses. He responded, "Your Honor, I beg the Court's pardon. I thought that I would need Officer Adelmann's testimony, but it appears that I have what I wanted to present to the Court so I rest."

The prosecutor, however, recalled Adelmann as a rebuttal witness. Adelmann testified that he did not use the police dog before Arebalos gave consent to search the tractor-trailer. On cross-examination, Adelmann discussed the consent form Arebalos signed. Adelmann said he explained the form to Arebalos and let him look it over. Arebalos signed without any questions. The consent form was admitted into evidence for purposes of the suppression motion, but it does not appear to be part of the appellate record.

6

After hearing argument, the trial court denied the suppression motion. It stated that Arebalos's story "doesn't make any sense" in light of the written consent form he signed. The court found that Arebalos gave consent and the search was proper.

B. *Analysis*

Arebalos contends that his consent was invalid because he was illegally detained at the time he gave it. He concedes that Adelmann had a valid reason to initiate a traffic stop, but he argues that the stop was unconstitutionally extended by Adelmann's investigation into matters unrelated to the stop. The Attorney General responds that Arebalos was not detained at the time of his consent (because Adelmann told him he was free to go) and, even if he were detained, his continued detention was not unconstitutional. We conclude Arebalos was not detained at the time of his consent. We therefore do not reach Arebalos's argument that the traffic stop was unconstitutionally extended.

We begin with our standard of review. " 'In reviewing a suppression ruling, "we defer to the superior court's express and implied factual findings if they are supported by substantial evidence, [but] we exercise our independent judgment in determining the legality of a search on the facts so found." ' " (*People v. Tully* (2012) 54 Cal.4th 952, 979 (*Tully*).) "Thus, while we ultimately exercise our independent judgment to determine the constitutional propriety of a search or seizure, we do so within the context of historical facts determined by the trial court. 'As the finder of fact . . . the superior court is vested with the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search

7

is constitutionally unreasonable.' [Citation.] We review its factual findings ' " 'under the deferential substantial-evidence standard.' " ' [Citation.] Accordingly, '[w]e view the evidence in a light most favorable to the order denying the motion to suppress' [citation], and '[a]ny conflicts in the evidence are resolved in favor of the superior court ruling' [citation]. Moreover, the reviewing court 'must accept the trial court's resolution of disputed facts and its assessment of credibility.' " (*Ibid.*)

"Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821 (*Manuel G.*).) "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, ' "by means of physical force or show of authority," ' terminates or restrains his freedom of movement, [citations] 'through means intentionally applied' [citation]." (*Brendlin v. California* (2007) 551 U.S. 249, 254 (*Brendlin*), italics omitted.)

"In situations involving a show of authority, a person is seized 'if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," ' or ' "otherwise terminate the encounter" ' [citation], and if the person actually submits to the show of authority [citation]." (*People v. Brown* (2015) 61 Cal.4th 968, 974 (*Brown*), quoting *Brendlin*, *supra*, 551 U.S. at pp. 254-255.) "This test assesses the coercive effect of police conduct as a whole, rather than emphasizing

8

particular details of that conduct in isolation.  [Citation.]  Circumstances establishing a seizure might include any of the following:  the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled.  [Citations.]  The officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant in assessing whether a seizure triggering Fourth Amendment scrutiny has occurred."  (*Manuel G.*, *supra*, 16 Cal.4th at p. 821.)

However, it is well-settled that "mere police questioning does not constitute a seizure."  (*Florida v. Bostick* (1991) 501 U.S. 429, 434 (*Bostick*).)  "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [citations]; ask to examine the individual's identification [citations]; and request consent to search his or her luggage [citation]—as long as the police do not convey a message that compliance with their requests is required."  (*Id.* at pp. 434-435.)

It is clear that Arebalos was detained when Adelmann initiated the traffic stop of Arebalos's tractor-trailer and Arebalos pulled to the side of the freeway.  (*Brendlin*, *supra*, 551 U.S. at p. 255 ["The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.' "]; *Whren v. United States* (1996) 517 U.S. 806, 809-810 (*Whren*).)  The issue here is whether that detention had ended by the time Arebalos gave his consent to search the tractor-trailer.

In general, a driver's detention at a traffic stop ends when he is told that he is free to leave.  "A lawful roadside stop begins when a vehicle is pulled over for investigation

9

of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." (*Arizona v. Johnson* (2009) 555 U.S. 323, 333.)

A police officer's questioning of a defendant after the stop has ended is consensual, and does not implicate the Fourth Amendment, unless a reasonable person would not have felt free to leave or otherwise terminate the questioning. "When the stop is over and its purpose served . . . , mere questioning by officers, without some indicated restraint, does not amount either to custody for *Miranda*[1] purposes or a seizure under the Fourth Amendment." (*United States v. Sullivan* (4th Cir. 1998) 138 F.3d 126, 131.) Although it appears no published California decision has considered this precise fact pattern, numerous federal and state appellate courts have come to the same conclusion. (See, e.g., *United States v. Moore* (10th Cir. 2015) 795 F.3d 1224, 1229; *United States v. Maynard* (D.C. Cir. 2010) 615 F.3d 544, 552-553 (*Maynard*); *United States v. Garcia* (8th Cir. 2010) 613 F.3d 749, 753; *United States v. Villegas* (10th Cir. 2009) 554 F.3d 894, 898-899; *United States v. Branch* (6th Cir. 2008) 537 F.3d 582, 588; *United States v. Wilson* (3d Cir. 2005) 413 F.3d 382, 387-388; *United States v. Thompson* (7th Cir. 1997) 106 F.3d 794, 798; *Tibbetts v. State* (Wyo. 2017) 388 P.3d 517, 521-522; *People v. Cosby* (2008) 231 Ill.2d 262, 277-278; *People v. Castañeda* (Colo. 2008) 187 P.3d 107, 109-110; *State v. Merrill* (2004) 322 Mont. 47, 51-52; *State v. Guscette* (N.D. 2004)

---

1       *Miranda v. Arizona* (1966) 384 U.S. 436.

10

678 N.W.2d 126, 130; *Dickerson v. Commonwealth* (2003) 266 Va. 14, 17-18; *State v. Williams* (2002) 255 Wis.2d 1, 15-16.)

Courts have emphasized that a police officer's admonition that the driver is "free to go" is an important factor in the Fourth Amendment analysis. (See, e.g., *State v. Green* (2003) 375 Md. 595, 618.) However, because courts must consider the totality of the circumstances in deciding whether a detention has occurred, the presence or absence of this admonition is not determinative if other factors show that a reasonable person would in fact feel free to leave or otherwise terminate the encounter (or not).

*Maynard*, *supra*, 615 F.3d 544 is instructive. In that case, a police officer stopped defendant's minivan for speeding. (*Id*. at p. 551.) The police officer asked defendant a few questions, talked with his partner (who arrived in a separate police car), and radioed a request for a canine unit. (*Ibid*.) After checking the defendant's license and registration, the police officer "returned to the rear of the van, where [the defendant] was still standing, gave [the defendant] back his identification, along with a warning citation, and told him he was free to leave. By that time, the canine unit had arrived on scene but remained in their vehicle. [The defendant] moved toward the front of the van and, as he reached to open the driver's-side door, [the officer] called out 'do you mind if I ask you a few additional questions?' " (*Ibid*.) The defendant walked back to the officer, answered the questions, and consented to a search of the van. (*Id*. at pp. 551-552.) The canine unit examined the van with a police dog and found $69,000 in cash. (*Id*. at p. 552.)

The federal appellate court held that the defendant was not detained when the police officer asked whether he would answer a few more questions. (*Maynard*, *supra*,

11

615 F.3d at pp. 552-553.) It explained, "[The police officer] had already returned [the defendant's] license and registration and told him he was free to go. Although there were by that time three police cars (two of which were unmarked) on the scene, [the police officer's] words and actions unambiguously conveyed to [the defendant] his detention was at an end. After that, [the defendant] returned to the front of the van—a clear sign he thought he was free to go. By remaining behind the vehicle as [the defendant] left, [the police officer] further assured [the defendant] he would not impede his leaving. Finally, [the defendant] turned around and came back only when [the police officer] re-initiated the stop by asking him if he would answer a few more questions. That [the police officer] shouted the question might in some circumstances turn it into a show of authority, but not here; the two were standing some distance apart on the side of a noisy interstate highway. In sum, the police did not seize [the defendant] by asking him whether he would answer a few more questions." (*Id.* at p. 553.)

Here, viewing the evidence in the light most favorable to the trial court's suppression order, we likewise conclude Arebalos was no longer detained at the time he gave his consent. The traffic stop itself was relatively nonconfrontational. Adelmann examined Arebalos's documents and asked reasonable questions for approximately 15 to 20 minutes. While a second CHP officer arrived at the scene at some point, the record does not show that his presence was accompanied by any unusual show of authority. After questioning Arebalos about his documents, Adelmann gave the documents back to him and told him he was free to leave. Arebalos walked several stops back to his tractor-trailer before Adelmann asked for Arebalos's consent to search the vehicle. Because

Adelmann had returned Arebalos's documents, told him he was free to leave, and allowed him to walk partway back to his vehicle, a reasonable person in Arebalos's position would in fact believe he was free to go when Adelmann asked for consent. Arebalos was no longer detained at that time. And, based on Adelmann's testimony, the request for consent itself was not coercive. Adelmann asked for consent and confirmed it in writing. The request was not accompanied by any explicit or implicit show of force, and Adelmann did not imply that compliance was required. It was therefore a consensual encounter, not a Fourth Amendment seizure. (See *Bostick*, *supra*, 501 U.S. at pp. 434-435.)

Arebalos's argument to the contrary relies on Adelmann's alleged command that Arebalos stop as he walked back to his tractor-trailer. But the only support for this alleged command comes from Arebalos's own testimony, which the trial court explicitly found not credible. It is the exclusive province of the trial court to determine the historical facts, and we must defer to the court's credibility determinations. (*Tully*, *supra*, 54 Cal.4th at p. 979.) We therefore do not consider Adelmann's alleged command in performing our independent review of the constitutionality of the interaction.

The authorities Arebalos cites in support of his argument involve factual situations far different from the circumstances here, and they are unpersuasive. (See *People v. Garry* (2007) 156 Cal.App.4th 1100, 1112 [pedestrian seized when police officer spotlighted defendant with his police car, "all but ran directly at him," and "ask[ed] defendant about his legal status as he did so"]; *People v. Jones* (1991) 228 Cal.App.3d 519, 523 [pedestrian seized when police car drove toward him, parked 10 feet away and

diagonally against traffic, and police officer said, "Stop. Would you please stop."];

*People v. Wilkins* (1986) 186 Cal.App.3d 804, 809 [occupants of station wagon seized when police officer stopped his car behind the station wagon, preventing them from exiting the vehicle].) None of these authorities involved completed, nonconfrontational traffic stops where the defendant had been told he was free to go.

In sum, Arebalos has not shown he was detained at the time Adelmann asked for his consent to search the tractor-trailer. We therefore need not decide whether any such detention would be illegal, e.g., as an unconstitutional extension of the traffic stop. (See *Rodriguez v. United States* (2015) __ U.S. __ [135 S.Ct. 1609, 1615-1616].) Arebalos has not presented any other argument why his consent to the search of his tractor-trailer was invalid. He has not shown the trial court erred by denying his motion to suppress.

## II

### *Second Motion to Suppress*

A.   *Additional Background*

Arebalos next contends the trial court erred by denying his second motion to suppress following his first trial and hung jury. At the time, Arebalos's case had been joined with a codefendant, Michael Farias.[2] At Farias's preliminary hearing, Adelmann testified about the circumstances of the traffic stop involving Arebalos. He said Arebalos's tractor-trailer had been pointed out to him by members of the regional

---

[2]   Farias later pleaded guilty to conspiracy to commit robbery (Pen. Code, §§ 182, 211) and conspiracy to transport methamphetamines (*id.*, § 182; Health & Saf. Code, § 11379). He was not part of Arebalos's trial or retrial.

14

narcotics suppression program. A member of the suppression program confirmed at the same hearing that they surveilled Arebalos's tractor-trailer.

In the second motion, Arebalos argued that Adelmann's testimony at Farias's preliminary hearing contradicted his testimony at the prior suppression hearing. Arebalos's counsel stated, "[T]his is new evidence, this is different evidence, this is different testimony, and it goes to the very heart of the credibility of Officer Adelmann, and that if in fact it turns out that the true reason for the stop was that that stop was going to happen regardless of whether there was a violation of law, that that's all information that the Court should be able to take into consideration." He claimed the only reason they were aware of the connection to the regional narcotics suppression program was because of Farias's preliminary hearing. In response, the prosecutor represented that he had provided Arebalos's prior counsel with discovery regarding the suppression program's surveillance before the initial suppression hearing. Arebalos's counsel did not dispute that the discovery had been provided to prior counsel.

The court denied Arebalos's second motion. It explained, "The evidence that's been provided, based on review of the transcript, the Court doesn't find it's really newly-discovered evidence or raises issues of the officer's credibility since the officer was merely answering questions as directed to him by counsel, and whatever reason there was for the objections at this time, there isn't really sufficient information to state that it was the officer who was for some reason being less credible by not disclosing this information. [¶] So the Court is going to rule as follows: That as to [Arebalos], there was a previous 1538.5 motion where the court heard the motion on the merits, that the

15

counsel was aware of the information regarding the surveillance of the defendant prior to that motion, did not raise that as an alternative theory, but simply brought in an issue about the illegal detention and search."

B.   *Analysis*

"As a general rule, a defendant is allowed only one pretrial suppression motion under section 1538.5 in the superior court, and that court is without jurisdiction to hear a second motion." (*People v. Nelson* (1981) 126 Cal.App.3d 978, 981; accord, *Madril v. Superior Court* (1975) 15 Cal.3d 73, 77-78.)  "Thus, a defendant is required to raise all available grounds in support of his motion at the initial pretrial hearing in the superior court.  As observed by the California Supreme Court in the context of raising new grounds on appeal, 'To allow a reopening of the question on the basis of new legal theories to support or contest the admissibility of the evidence would defeat the purpose of Penal Code section 1538.5 and discourage parties from presenting all arguments relative to the question when the issue of admissibility of evidence is *initially raised*.' [Citation.]  That observation is equally valid in the context of pretrial proceedings, where allowing a defendant to raise each of the grounds for suppression at a separate hearing would result in inefficient use of court time, potentially duplicative presentation of evidence, and the possibility of a delayed trial."  (*Nelson*, at pp. 981-982.)

As Arebalos notes, however, certain authorities have found an exception to this general rule where a defendant has not had a full and fair opportunity to litigate his motion to suppress.  (See *People v. Brooks* (1980) 26 Cal.3d 471; *People v. Smith* (2002) 95 Cal.App.4th 283.)  In *Brooks*, the trial court initially granted a defendant's motion to

16

suppress based on one ground and did not consider an alternate ground. (*Brooks*, at p. 474.) When that ruling was later reversed, the trial court considered the alternate ground in a renewed suppression hearing and granted the motion again. (*Id.* at pp. 474-475.) The Supreme Court held that the trial court correctly considered the alternate ground on remand: "[D]efendant was deprived of an opportunity for a full hearing on the merits of his entire motion to suppress as initially made. Consequently the renewed hearing amounted to neither consideration of a second section 1538.5 motion nor a relitigation of his original motion, but rather a completion of the full hearing to which he was entitled." (*Id.* at p. 481.) In *Smith*, the trial court limited the issues in a motion to suppress based on a local procedural rule. (*Smith*, at p. 290.) When the defendant attempted to supplement his motion to raise the excluded issues, the trial court denied defendant's request for lack of jurisdiction. (*Id.* at pp. 292-293.) On appeal, this court held that the trial court erred by limiting the issues in the first motion to suppress. (*Id.* at pp. 302-303.) This court also held that the trial court erred by refusing the defendant's effort to supplement his motion: "Like the defendant in *Brooks*, Smith 'was deprived of an opportunity for a full hearing on the merits of his entire motion to suppress.' [Citation.] . . . Because Smith was entitled to fully litigate the adequacy of the prosecution's inventory search justification, the trial court erred by denying Smith's supplemental section 1538.5 motion that specifically set forth this infringement of his right to a full hearing." (*Smith*, at p. 305.)

In contrast to *Brooks* and *Smith*, the trial court here did not deprive Arebalos of the opportunity for a full hearing on the merits of his entire motion to suppress. The court

did not limit Arebalos to a certain legal ground to the exclusion of others.  Indeed, aside from the merits of the court's ruling (see pt. I, *ante*), Arebalos does not claim the trial court erred in its conduct of the first suppression hearing.  The court therefore had nothing to correct or complete at a second, supplemental suppression hearing.

Arebalos argues that he was entitled to a second suppression hearing based on new evidence of the regional narcotics suppression program's surveillance of Arebalos's tractor-trailer.  He cites *People v. Superior Court* (*Edmonds*) (1971) 4 Cal.3d 605, 611, for the proposition that a defendant may make a new suppression motion "based upon grounds either unavailable or unknown to defendant at the time his prior motion was denied."  Such grounds might include "an intervening change in the applicable law or the discovery of new evidence in support of suppression."  (*Ibid*.)  But, as the Attorney General points out, *Edmonds* specifically contemplated a new suppression motion *at trial*, and the statute is correspondingly limited.  (§ 1538.5, subd. (h); see *People v. Young* (1976) 62 Cal.App.3d 49, 51-52.)  It does not allow serial *pretrial* motions based on new law or evidence.  (See *People v. Williams* (1979) 93 Cal.App.3d 40, 59-60.)

In any event, even considering the substance of Arebalos's argument, he has not shown error.  Whether Arebalos's proffered evidence was *new* appears to be a factual issue that we review for substantial evidence.  (See *Tully*, *supra*, 54 Cal.4th at p. 979; *People v. Memro* (1995) 11 Cal.4th 786, 844-845.)  Here, the trial court explicitly found that Arebalos's proffered evidence was not new.  There was no "newly-discovered evidence" bearing on Adelmann's credibility, and "[defense] counsel was aware of the

18

information regarding the surveillance of the defendant prior to [the first] motion." The evidence supports the trial court's findings.

As to Adelmann's credibility, we conclude the court could reasonably find that Adelmann's testimony at Farias's preliminary hearing did not contradict his prior testimony at the suppression hearing and no credibility issue was raised. Adelmann's testimony at the suppression hearing regarding his first contact with Arebalos's tractor-trailer properly responded to the framing of the prosecutor's foundational questions. He was not called upon to testify regarding the circumstances that led to that contact or his communications with the surveillance team.

As to the surveillance evidence, we conclude the court could likewise reasonably find that Arebalos's counsel was aware of at least the essential facts regarding the surveillance of Arebalos's tractor-trailer prior to the first suppression hearing. It appears undisputed that Arebalos was provided discovery before the first suppression hearing describing that surveillance. Indeed, Arebalos's counsel showed his knowledge by asking Adelmann a leading question about the reason for his focus on Arebalos's tractor-trailer ("Had you been notified prior to the stopping of this vehicle that this vehicle was carrying contraband?"). When the court asked Arebalos's counsel to explain the relevance of the question, he abandoned the inquiry.

Arebalos asserts he was unaware at the first hearing of "extensive evidence regarding the regional narcotics task force surveillance" of him. But, beyond speculation, Arebalos does not explain—and nothing in the record shows—what this evidence was, what was allegedly new about it, and how it was material to the suppression motion.

19

Without such details, Arebalos's claim fails.  Arebalos focuses on Adelmann's motivation for stopping Arebalos's tractor-trailer, but the trial court could reasonably find that Arebalos's counsel knew prior to the first suppression hearing that Adelmann's motivation was to investigate Arebalos for drug trafficking.  Arebalos's counsel therefore knew enough to articulate the potential relevance of his leading question, which Arebalos asserts was to explain the reasons for the stop, and pursue it and similar topics at the first suppression hearing.[3]  He therefore had the opportunity to present these arguments at the time of that hearing; he simply did not do so.

In sum, Arebalos had a full and fair opportunity to litigate the grounds of his motion at the first suppression hearing, and he has not substantiated his claim that he discovered new evidence after that hearing that was material to the issues in the motion. He therefore has not shown the court erred by denying his second suppression motion.

---

[3]    Even if such testimony had been pursued, we note that a police officer's subjective motivation for initiating a traffic stop is irrelevant under the Fourth Amendment where the stop is supported by probable cause.  (*Whren*, *supra*, 517 U.S. at p. 813.)  Similarly, "[t]he officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant in assessing whether a seizure triggering Fourth Amendment scrutiny has occurred."  (*Manuel G.*, *supra*, 16 Cal.4th at p. 821.)

DISPOSITION

The judgment is affirmed.

GUERRERO, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.